## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AMIGO PETROLEUM COMPANY, a New
Mexico corporation,

    Plaintiff,

vs.               No. CIV 03-1200 MV/WDS

EQUILON ENTERPRISES LLC, a Delaware
limited liability company d/b/a SHELL OIL
PRODUCTS US,

    Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for a Preliminary

Injunction **[Doc. No. 3]**, filed October 23, 2003. The Court, having considered the motion,

briefs, relevant law and being otherwise fully informed, finds that the motion is well-taken and

will be **GRANTED.**

### BACKGROUND

Plaintiff Amigo Petroleum Company is a New Mexico corporation engaged in the

wholesale distribution and retail sale of refined petroleum products, primarily under the brand

names of "Texaco," "Conoco," "Phillips 66," "Exxon," and "Mobil." Amigo was created through

a merger between Berridge Distributing Company, Inc. and Macaluso Oil Company, Inc. in

March 2000. Defendant Equilon Enterprises LLC is a petroleum supplier and refiner that was

formed in 1998 as a joint venture of Shell Oil Company and Texaco, Inc. and that marketed fuel

1

under both brand names.  In 2002. when Texaco merged with Chevron Corporation, Shell Oil

Company purchased Texaco's interest in Equilon.  Thereafter. Equilon began doing business as

Shell Oil Products US (Shell).[1]

At present, Amigo buys 33 million gallons of Texaco-brand fuels annually and resells the

fuels through service stations owned and operated by Amigo and others.  Amigo and its

predecessors have been purchasing the Texaco-brand fuel from Shell and its predecessors since

1960 under a series of fuel supply contracts called Wholesale Marketer Agreements (WMAs).  In

general. under the WMAs, Equilon sold Amigo fuel at typically favorable, wholesale prices and

permitted Amigo to resell the fuel under the Texaco-brand.  In return. Amigo agreed not to

deliver or sell fuel from any other supplier to its Texaco-brand service stations.  Additionally. the

Texaco-branded service stations supplied by Amigo were obliged to conform to Equilon's image

requirements.  While Amigo would shoulder the cost of upgrading service stations to meet these

requirements (which would change periodically), Equilon would offer rebates to its marketers to

defray some of these costs.

In 2000. Equilon and Amigo entered into their last Texaco-WMA which created a

franchise relationship that was to run until June 30. 2002.  Under this Texaco-WMA. Equilon

gave Amigo the right to use the Texaco-brand identifications and retained the right to terminate

the agreement. or not to renew it, for grounds specified in the WMA itself or under the Petroleum

Marketing Practices Act (PMPA). 15 U.S.C. §§ 2801-2841 (1978. as amended in 1994).  Among

---

[1]To clarify, the Court will use the name Equilon to refer to the Shell-Texaco joint venture that predated the Chevron-Texaco merger and the name Shell to refer to the entity that succeeded Equilon after the merger.

the grounds listed in the Texaco-WMA is the "[l]oss of Seller's [Equilon's] right to use the Identifications, which are the subject of the franchise." Exhibit 1 to Complaint, ¶25(a)(3)(iv).

In October 2001, when the ChevronTexaco merger was finalized and Shell bought Texaco's interest in Equilon, Shell lost the right to grant use of the Texaco brand on an exclusive basis as of June 30, 2004 and on a non-exclusive basis as of June 30, 2006. The present dispute concerns subsequent events surrounding attempts to replace the last Texaco-WMA that had been executed between Equilon and Amigo in 2000.

Shell states that the Chevron acquisition impacted all Texaco-WMAs that had been executed by its predecessor, Equilon, since Shell was required to terminate every Texaco-WMA and franchise relationship, effective June 30, 2006 - the date on which Shell's license from ChevronTexaco to use the Texaco-trademark would expire. In light of this change, Shell claims it approached Amigo to discuss replacing the Texaco-WMA with a Shell-WMA as early as October 2001 and continued to raise the matter through 2002. Shell states both that Amigo resisted such overtures but also acted in a manner suggesting Amigo wanted to continue the franchise relationship.

Meanwhile, Shell sent a Notice of Nonrenewal dated February 4, 2002 to every Texaco-wholesaler that had executed a Texaco-WMA with the former entity Equilon, including Amigo. The Notice sent to Amigo extended the Texaco-WMA and the franchise relationship with Equilon's successor, Shell, until June 30, 2006. In other words, nonrenewal of the Texaco-WMA would become effective on that date. The Notice also stated that "Equilon [doing business as Shell] reserves all of its rights, including but not limited to the right to supplement or rescind the extension referenced above or to supplement or rescind this notice with another

3

notice based on another ground for termination or nonrenewal." Exhibit 2 to Mot. for Prelim. Injun., at 1.

Having satisfied the PMPA's requirement of notice prior to nonrenewal, Shell states it then began implementing a "Fast Fusion" program to convert its Texaco-brand wholesalers to the Shell brand, in light of the loss of the right to sell products under the Texaco name. Among the franchises selected for conversion in early 2002 was Amigo, which was offered the same replacement Shell-WMA as numerous other franchisees. Shell explains that the Shell-WMA was offered in good faith and in the normal course of business of the "Fast Fusion" process. Significantly, Shell contends that the replacement WMA was the only way the parties could continue their franchise relationship because of a deal previously entered into by Amigo and Shell's predecessor, Equilon.

That transaction, which was completed in August 2000, involved the execution of an Offer of Agreement to Purchase Real Property and Other Property from Equilon (Agreement) between Equilon and Amigo. Under the Agreement, Amigo agreed to buy Equilon's fee or leasehold interests in eleven retail locations and was required to include a Brand Covenant in the deed for each of the locations. In part, the Brand Covenant states:

> Additional consideration furnished by Grantee [Amigo], as an inducement to Grantor [Equilon] to grant and convey the Premises, is a covenant and agreement to retain the Texaco brand at the Premises pursuant to the terms and conditions of Grantor's Wholesale Marketer Agreement, or its replacement, over a ten (10) year period ending on the 10th anniversary date of this deed or assignment (the "Brand Covenant"). Grantee hereby acknowledges that the terms, conditions and duration of the Brand Covenant are fair and reasonable, and were negotiated between Grantor and Grantee. With Grantor's prior written consent, during the term of the Brand Covenant, Grantee may rebrand to another brand then being offered by Grantor, but always subject to the terms of this covenant and agreement.

4

Exhibit 3 to Complaint, at A-1. In other words, Amigo agreed to retain the Texaco-brand or another brand offered by Equilon at the eleven stations for ten years, subject to certain exceptions.

Shell explains that because the merger was terminating its right to use the Texaco-brand and because the Brand Covenant was still in effect at the time in question, Amigo was required to agree to the replacement Shell-WMA to remain in compliance with the Brand Covenant. When Amigo refused to sign the Shell-WMA after months of communications, Shell invoked its right under § 2802(b)(3)(A) of the PMPA to nonrenew the franchise relationship before the end date used in the WMA.[2] In a letter dated August 7, 2003, Shell rescinded the Notice of Nonrenewal that had granted Amigo a four-year extension on its Texaco-WMA.[3] In another letter dated August 8, 2003, Shell stated it was nonrenewing the parties' contractual and franchise

---

[2]Section 2802(b)(3)(A) describes the following as permissible "grounds for nonrenewal of a franchise relationship:"

> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if--
> > (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
> > (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

[3]Amigo states that although the letter is dated August 7, 2003, it did not receive the letter until September 7, 2003.

5

relationship as of November 30, 2003.[4]  In support of the nonrenewal, Shell cited Amigo's

"failure to agree" to the purportedly necessary change in the franchise relationship and the related

alleged violation of the Brand Covenant.[5]

On July 16, 2003, Amigo filed a Complaint seeking damages and injunctive relief under

the PMPA, as well as declaratory relief in the First Judicial District Court, Santa Fe County, New

Mexico.  On September 23, 2003, Amigo filed a First Amended Complaint in the same court.

Defendant Shell filed a notice of removal to this Court on October 16, 2003.  Subsequently, on

October 23, 2003, Plaintiff filed a motion requesting a preliminary injunction against

Defendant's nonrenewal, otherwise effective November 30, 2003.  Defendant filed a response on

November 10, 2003, and Plaintiff followed by filing a reply on November 13, 2003.  Plaintiff

also filed a Notice requesting oral argument on the motion for the preliminary injunction on

November 14, 2003.

Amigo contends that Shell's offer of the replacement Shell-WMA was discriminatory and

not made in good faith.  Principally, Amigo argues that Shell's February 4, 2002 Notice of

Nonrenewal had extended the Texaco-WMA for another four years and was still in effect when

Shell insisted it agree to the Shell-WMA.  Shell's license to use the Texaco-brand did not expire

until June 30, 2006, at the latest, and the extension was specifically made to correspond to that

date.  Thus, Plaintiff contends that the Shell-WMA was offered prematurely, even after taking

---

[4]Amigo states that although the letter is dated August 8, 2003, it did not receive the letter until August 25, 2003.

[5]The letter further stated that the $681,190.95 in recapture amounts, incentives or loans owed by Amigo to Shell pursuant to their contractual relationship would come due on November 30, 2003 as well.

the Brand Covenant into account, and that its "failure to agree" to the Shell-WMA does not

qualify as grounds permitting nonrenewal according to the PMPA. Accordingly, it seeks an

injunction against Shell's nonrenewal on November 30, 2003.

The Court, having reviewed the motion, briefs, relevant law and evidence presented, finds

oral argument unnecessary at this time.

## STANDARD

"The [Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2841 1978, as amended in

1994) governs franchise arrangements for the sale, consignment, or distribution of motor fuel 'in

commerce,' and protects franchisees from arbitrary or discriminatory termination or nonrenewal

of their motor fuel franchises." *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 855 (7th

Cir. 2002). In enacting the PMPA, Congress sought to level the "disparity of bargaining power"

between petroleum franchisors and franchisees in light of a concern that their franchise

agreements were little more than "'contracts of adhesion' that perpetuate[d] the 'continuing

vulnerability of the franchisee to the demands and actions of the franchisor.'" *Graham Oil v.

ARCO Products Co.*, 43 F.3d 1244, 1246 (9th Cir. 1994) (quoting S. REP. NO. 731 (1978),

*reprinted in* 1978 U.S.C.C.A.N. 873, 876).

Not surprisingly then, the "standards for granting an injunction [under the PMPA] are

more lenient than the standards under Fed.R.Civ.P. 65." *Ewing v. Amoco Oil Co.*, 823 F.2d

1432, 1436 (10th Cir. 1987). Under Rule 65, a movant must show a substantial likelihood of

success on the merits, irreparable harm if the injunction is denied, that the harm threatened to the

movant outweighs any injury the injunction might cause to the nonmovant, and that an injunction

is not adverse to the public interest. *Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th

7

Cir. 2003). By contrast, the PMPA states that a preliminary injunction shall be granted under if

> (A) the franchisee shows--
>> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
>> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation: and
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2).

In other words, under the PMPA, the "movant need only show that the 'balance of hardships *preponderates* in favor of the franchisee.'" Ewing, 823 F.2d at 1436 (citations omitted) (emphasis added). In addition, courts have read the "sufficiently serious questions" requirement as warranting "less of a showing of likely success than is generally required under Rule 65." *Id.* (citing cases).

In conducting this analysis, the Court is to be mindful that the PMPA specifies that "the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship" and the franchisor shall have the burden of presenting evidence "to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title." 15 U.S.C. § 2805(c). That is, the franchisor retains the burden of demonstrating statutory compliance. *Ewing,* 823 F.2d at 1436 (citing *Khorenian v. Union Oil Co.,* 761 F.2d 533, 535 (9th Cir. 1985)).

## DISCUSSION

A.    **Existence of termination or nonrenewal**

8

The parties do not dispute the existence of termination or nonrenewal in the instant case. Defendant sent Plaintiff a letter dated August 7, 2003 rescinding the four-year extension of the Texaco-WMA and another letter dated August 8, 2003 providing Amigo notice of nonrenewal, effective November 30, 2003. Thus the first requirement for a grant of a preliminary injunction under the PMPA has been met.

**B.     Existence of "sufficiently serious questions"**

Plaintiff presents three principal arguments why Defendant should not be permitted to terminate or nonrenew the franchise agreement. First, Plaintiff states that Defendant should be estopped from rescinding the four-year extension of the 2000 Texaco-WMA because it has detrimentally relied on the extension and has made business plans on the assumption that WMA would remain in effect until June 30, 2006. Second, Plaintiff claims that its "failure to agree" to the replacement Shell-WMA does not justify nonrenewal under § 2802(b)(3)(A) of the PMPA because the Shell-WMA itself violated § 2805(f). Third, Plaintiff alleges that Defendant acted discriminatorily and in bad faith by rescinding only Plaintiff's four-year extension on the Texaco-WMA but no other franchisee's extension, and then invoking Plaintiff's subsequent "failure to agree" to the prematurely offered Shell-WMA as grounds for nonrenewal under the PMPA. Because the Court finds the second question presents "sufficiently serious questions" as to the merits of the case, substantial enough to constitute "fair ground for litigation," the Court expresses no opinion as to the adequacy of the first and third issues.

Section 2805(f) states, "No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive . . . any right that the franchisee may have under any valid and applicable State law." Plaintiff contends that the Shell-

9

WMA contained waiver and release provisions that would have caused Plaintiff to surrender rights created by New Mexico statutes. In part, Plaintiff points to Paragraph 15, the "WARRANTY AND DISCLAIMER" provision, which states, "SELLER WARRANTS THAT ALL PRODUCTS SOLD TO BUYER WILL MEET SELLER'S THEN CURRENT SPECIFICATIONS. *SELLER MAKES NO OTHER WARRANTIES OF ANY KIND AS TO THE PRODUCTS SOLD TO BUYER, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.*" Exhibit 5 to Mot. for Preliminary Injunction, ¶15 (italics added).

Under NMSA 55-2-314, "[u]nless excluded or modified (Section 2-316 [55-2-316 NMSA 1978]), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Under NMSA 55-2-315, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section [55-2-316 NMSA 1978] an implied warranty that the goods shall be fit for such purpose." ]

Citing *Coast Village, Inc. v. Equilon Enterprises, LLC*,163 F.Supp.2d 1136, 1178 & n.38 (C.D. Cal. 2001), Defendant emphasizes that § 2805(f) only applies where renewal of a franchise agreement is "conditioned upon" the franchisee's waiver of state law or federal rights. In the instant case, Defendant contends Plaintiff never disputed or attempted to negotiate the disclaimer and that therefore Plaintiff cannot claim that the Shell-WMA was "conditioned" on acceptance of that provision. Relying on *Graham Oil v. ARCO Products Co.*, 43 F.3d 1244, 1248 (9th Cir. 1994), Defendant also argues that even if the warranty disclaimer violates § 2805(f), that

10

provision may be severed from the remaining agreement.  Suggesting Plaintiff's complaint

regarding the warranty disclaimer is only pretext, Defendant points out that even the Texaco-

WMA of which Plaintiff seeks to prevent termination or nonrenewal through the preliminary

injunction, contains the same warranty disclaimer as in the Shell-WMA.  At this stage of the

proceedings. Defendant's arguments are misplaced.  The Court need not rule on whether

Plaintiff's claim is actually meritorious but, in the words of one court, need only be convinced

that the plaintiff has a "reasonable chance of success on the merits." *Khorenian v. Union Oil Co.*

*of Calif.*, 761 F.2d 533. 535 (9th Cir. 1985) (quoting *Moody v. Amoco Oil Co.*, 734 F.2d 1200.

1216 (7th Cir.), *cert. denied* 469 U.S. 982 (1984)).  Thus, the burden on Plaintiff is fairly low,

and the Court only must conclude that the issue of whether inclusion of the warranty disclaimers

rendered the Shell-WMA in violation of § 2805(f) is important enough to create a "fair ground

for litigation."  Since resolution of this question directly impacts Defendant's ability to establish

an affirmative defense and none of Defendant's contentions show that Plaintiff lacks a

"reasonable" chance of succeeding at trial, the Court finds Plaintiff has met its burden.  *Accord*

*Dersch Energies, Inc. v. Shell Oil Co.,* 314 F.3d 846. 862 (7th Cir. 2002) (stating in dicta, "if a

franchisor impermissibly conditions the renewal of a franchise relationship on the franchisee

releasing or waiving federal or state law rights, and the franchisee's refusal to agree to this

conditional renewal results in the nonrenewal of that relationship, the franchisor's violation of §

2805(f)(1) may be examined in conjunction with the franchisee's claim for the nonrenewal of its

franchise relationship.")

### C.    Balance of hardships

Shell does not dispute Amigo's claim that it will suffer greater hardship from the denial of

11

an injunction than Shell would suffer from the imposition of one.  Shell only states that any

hardship Amigo endures is the result of its own doing.  However, as stated earlier, whether the

nonrenewal is justified is not a matter to be decided at the present time.  Under the relevant

balancing analysis, the Court finds that Amigo would in fact suffer greater injury if an injunction

were to be denied, than Shell would suffer if the injunction is imposed.  If the nonrenewal is

permitted as Shell requests, Amigo states it will be "unable to supply Texaco-branded gasoline to

the 31 Texaco service stations it now supplies." Mot. for Prelim. Injunc. at 23.  Amigo will incur

$2 million in expenses to remove the Texaco identifications currently used at thirty-one of its

locations.  Moreover, time is a critical issue:  if the injunction were denied, Amigo is doubtful it

could complete the necessary debranding by November 30, 2003 and change business plans (e.g.,

advertising) necessitated by the debranding.  By contrast, the Court has been presented with no

evidence or affidavits indicating that Shell would be harmed by continuing to supply Amigo with

fuel products and having Texaco-branded fuel sold through Amigo's service stations.  Thus, the

Court finds that a weighing of the competing hardships more than just "tips" in favor of Amigo.


## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for a Preliminary Injunction

**[Doc. No. 3]**, is hereby **GRANTED.**  Defendant is accordingly enjoined from terminating

12

Amigo's Texaco-Wholesale Marketer Agreement and from nonrenewing the parties' franchise

relationship until the a judgment is rendered on the merits of this case.


Dated this 26th day of November, 2003.


MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE


Attorney for Plaintiff:
Gregory D. Huffaker. Jr.
Russell C Powell
William L Taylor

Attorney for Defendant:
Bradford C. Berge

13