IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AMIGO PETROLEUM COMPANY,
a New Mexico corporation,

Plaintiff,

v.                                                    Civ.  No. 03-1200 JH/WDS

EQUILON ENTERPRISES LLC,
a Delaware limited liability company,
doing business as SHELL OIL
PRODUCTS US,

Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on *Defendant's Motion for Summary Judgment* [Doc.

No. 15] and *Plaintiff's Motion for Partial Summary Judgment* [Doc. No. 28], as well as *Defendant's*

*Motion to Strike Plaintiff's Second Supplemental Brief* [Doc. No. 81].[1]  This is a commercial

contract dispute between a wholesale distributor of petroleum products and a petroleum supplier.

The central issue in both motions is the relative rights and responsibilities of the parties regarding their

business relationship.  After careful consideration of the undisputed facts, the law, and the arguments

set forth by the parties, the Court concludes that Plaintiff is entitled to partial summary judgment in

its favor on its claim against Defendant for violation of the federal Petroleum Marketing Practices

Act.  In addition, Plaintiff is entitled to partial summary judgment in its favor on Defendant's

---

[1] This motion relates to the second supplemental brief [Doc. No. 80], which Amigo filed
without leave of court ten days after the October 14, 2005 hearing on the cross motions for
summary judgment.  Because the Court has already considered the briefs on both motions for
summary judgment as well as an additional set of supplemental briefs [Doc. Nos. 41, 45, 48, and
55 Ex. 1] and has heard oral argument on the matter, Amigo's attempt to file yet more briefs will
be rejected.

counterclaim for anticipatory breach of contract.  As further explained below, the Defendant is entitled to partial summary judgment on the remainder of its counterclaim.

## <u>LEGAL STANDARD</u>

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co*., 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  The material facts are those identified by controlling law as essential elements of claims asserted by the parties. In other words, the materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine as to such facts if the evidence is sufficient for a reasonable trier of fact to find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party.  *Id*.  However, the Court is not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones.  *Lucas v. Dover Corp.*, 857 F. 2d 1397, 1401 (10th Cir. 1988).  In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Id*.  Nevertheless, a jury question does not exist because of the

presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question. *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995).

The Court will consider the parties' competing motions for summary judgment in light of these principles.

## FACTUAL AND PROCEDURAL HISTORY

The following facts, unless otherwise noted, are undisputed.

Plaintiff Amigo Petroleum Company ("Amigo") was created through a merger between Berridge Distributing Company, Inc. and Macaluso Oil Company, Inc. in March 2000. Amigo is a New Mexico corporation engaged in the wholesale distribution and retail sale of refined petroleum products in New Mexico, primarily under the brand names of Texaco, Conoco, Phillips 66, Exxon, and Mobil. Defendant Equilon Enterprises LLC ("Equilon") is a petroleum supplier and refiner that was formed in 1998 as a joint venture of Shell Oil Company and Texaco, Inc. and that marketed fuel under both of those brand names. In October of 2001, Texaco, Inc. merged with Chevron Corporation. On February 13, 2002, Shell Oil Company purchased Texaco's interest in Equilon, which then began doing business as Shell Oil Products US ("Shell").[2]

Amigo has purchased Texaco-brand fuels and resold them at service stations owned and operated by Amigo and others. Amigo and its predecessors have been purchasing the Texaco-brand fuel from Equilon and its predecessors since 1960 under a series of fuel supply contracts called wholesale marketer agreements ("WMAs"). In general, under the WMAs, Equilon sold Amigo fuel at wholesale prices and permitted Amigo to resell the fuel under the Texaco brand name. In return,

---

[2] Despite the fact that Equilon has undergone these changes in ownership and business names, for the purposes of simplicity and clarity the Court will refer to it as Equilon throughout this Memorandum Opinion and Order.

Amigo agreed not to deliver or sell fuel from any other supplier to its Texaco-brand service stations. Additionally, the Texaco-branded service stations supplied by Amigo were obliged to conform to Equilon's brand image requirements.  Although Amigo bore the cost of upgrading service stations to meet these requirements, Equilon offered certain incentives defray some of these costs.

In March of 2000, Equilon (seller) and Amigo (buyer) entered into their last WMA for the sale of Texaco-brand gasoline.  This final "Texaco-WMA" created among the parties a franchise relationship that was to continue until June 30, 2002, "subject to Seller's right to terminate or not renew this Agreement in accordance with applicable law."   Texaco-WMA at ¶ 4.  The WMA also provided that "[u]pon expiration, this Agreement will continue on a month-to-month basis for no longer than 6 months until the parties either execute a new agreement or Seller terminates or does not renew this Agreement in accordance with applicable Law."  *Id.*  In other words, under the Texaco-WMA, Equilon gave Amigo the right to use the Texaco-brand identifications and retained the right to terminate the agreement, or to not renew it, for grounds specified in the WMA itself or under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 et seq.  Among the grounds listed in the Texaco-WMA is the "[l]oss of the Seller's [Equilon's] right to grant the right to use the Identifications, which are the subject of the franchise."   Texaco-WMA at ¶ 25(a)(3)(iv). The WMA also provides that "[u]pon termination or nonrenewal of this Agreement, Buyer shall immediately cease, and cause the operators of Buyer's Outlets to immediately cease, marketing and selling the Products and otherwise using the Identifications or any marks confusingly similar thereto."

In August of 2000, Amigo and Equilon executed a document titled "Offer of Agreement to Purchase Real Property and Other Property from Equilon Enterprises LLC" ("Purchase Agreement"). Under the Purchase Agreement, Amigo agreed to purchase Equilon's fee or leasehold interests at

eleven service stations.[3]   The Purchase Agreement contains the following language, known as a

"Brand Covenant":

> (a) Purchaser shall retain **a brand offered by Equilon** at each of the
> Fee Premises and Leasehold Premises ("Brand Covenant") pursuant
> to the terms and conditions of Equilon's standard WMA, or its
> replacement, for a period starting on the Closing Date and ending on
> the 10th anniversary of the Closing Date ("Covenant Period"), except
> that in the case of any Leasehold Premises, such period will in no case
> continue after the date on which Purchaser no longer has the right to
> sell motor fuel from the Leasehold Premises.
> (b) Purchaser shall improve, use, lease, sell, encumber, or transfer the
> Fee Premises or Leasehold Premises, subject to the Brand Covenant.
> **The Brand Covenant runs with the land** ....
> (c) Purchaser will be excused from complying with the Brand
> Covenant for a particular Fee Premises or Leasehold Premises if: ...
> > (ii) The WMA is terminated by Equilon other than by reason
> > of Purchaser's default thereunder or Purchaser's refusal to
> > agree to changes in the WMA required by Equilon or its
> > successor in good faith and in the normal course of business....

Purchase Agreement at ¶ 15.5 (emphasis added).   Under this provision, Amigo would be obligated

to retain a brand offered by Equilon at all eleven locations; however, it does not mention any specific

brand.   The Purchase Agreement also provided that the Brand Covenant survives closing, runs with

the land, and must appear in the special warranty deed or assignment of lease in the form of Exhibit

A to the Purchase Agreement.   *Id.*

However, the Brand Covenant language contained in Exhibit A to the Purchase Agreement

does not contain wording identical to that contained in Paragraph 15.5.   Rather, the Brand Covenant

contained in Exhibit A states that Amigo must carry the Texaco brand unless it asks for and receives

---

[3] Under the Purchase Agreement and corresponding deeds, Equilon sold eight of the
locations to Amigo in fee simple.   With regard to the remaining three locations, Equilon conveyed
its leasehold interests to Amigo via the Purchase Agreement and an assignment of lease.   Both the
deeds and the assignment of lease were recorded in the real property records.

5

permission to rebrand to another brand offered by Equilon:

> Additional consideration furnished by Grantee, as an inducement to Grantor to grant and convey the Premises, is a covenant and agreement to retain **the Texaco brand** at the Premises pursuant to the terms and conditions of Grantor's Wholesale Marketer Agreement, or its replacement, over a ten (10) year period ending on the10th anniversary of the date of this deed or assignment (the "Brand Covenant"). Grantee hereby acknowledges that the terms, conditions and duration of the Brand Covenant are fair and reasonable, and were negotiated between Grantor and Grantee. With Grantor's prior written consent, during the term of the Brand Covenant, **Grantee may rebrand to another brand then being offered by Grantor**, but always subject to the terms of this covenant and agreement.

Exhibit A to Purchase Agreement (emphasis added). As stipulated in the Purchase Agreement, it was this Brant Covenant language from Exhibit A, not the Brand Covenant contained in Paragraph 15.5 of the Purchase Agreement, that was included in the individual warranty deeds to the properties that Amigo purchased from Equilon, as well as in the assignment of lease that memorialized the sale of leasehold interests.

In the meantime, in May of 2000, Chevron and Texaco had announced their planned merger, though it would not be finalized until October of 2001. The upcoming Chevron-Texaco merger had caused concerns that it would violate federal antitrust laws by causing a substantial decrease in competition in a variety of areas, such as the marketing of gasoline in various portions of the United States, including but not limited to Arizona, Idaho, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. *See* FTC Notice, File No. 011 0011, 66 F.R. 48136 at *48138 (Sept. 18, 2001). On September 7, 2001, the Federal Trade Commission ("FTC") published a proposed Consent Order concerning the merger of Chevron and Texaco. In the proposed Consent Order, the FTC agreed to approve the merger if, *inter alia*, Texaco divested its interests in Equilon on terms

approved by the FTC.   Accordingly, as a result of the merger, Equilon (now known as Shell) would

lose the right to allow Amigo to sell the Texaco brand on an exclusive basis as of June 30, 2004, and

then lose the right to use the Texaco brand on a non-exclusive basis beginning June 30, 2006.  The

FTC also required Texaco to offer Equilon a license to continue to use the Texaco brand at its retail

outlets.  The length of time that Texaco was required to offer the license to Equilon depended on

whether Equilon agreed to waive and release certain marketer liabilities under facility improvement

agreements, as well as any deed restrictions prohibiting the sale of motor fuels other than Texaco-

branded fuels at various retail locations.[4]  Paragraph IV.B of the FTC's proposed Consent Order

defined the terms of the required waiver and release by Equilon:

> For the purposes of this Paragraph IV., "Waives and Releases" shall
> mean to waive and release: (1) all amounts any Texaco branded dealer
> or wholesale marketer may be required to pay under any Facility
> Development Incentive Program Agreement ... ; and (2) **all deed
> restrictions prohibiting or restricting the sale of motor fuel not
> sold by Equilon or Motiva at any Texaco retail outlet for which
> Equilon or Motiva has not executed an agreement for the sale of
> Shell branded gasoline on or before the Brand License Date [June
> 30, 2003].**

(emphasis added).

On January 2, 2002, the FTC issued a Decision and Order that restated and adopted the terms

of the Proposed Consent Order.  In accordance with the FTC's order, Equilon and Texaco executed

a Waiver and Release Agreement effective February 13, 2002.  Their agreement provides that:

> Equilon hereby agrees to waive and release ... **all deed restrictions
> prohibiting or restricting the sale of Refinery Fuel Products not
> sold by Equilon at any Texaco branded Service Station** provided,
> however, that the preceding sentence shall not apply with respect to
> any Texaco branded Service Station whose owner, dealer, or

---

[4]Equilon was not a respondent in the FTC's proceedings.

>**wholesale marketer terminates** its Texaco brand relationship with
>Equilon prior to the Brand Expiration Date [June 30, 2004].

(emphasis added).

During this time, Amigo was not entirely in the dark as to the implications of the upcoming merger.  In October of 2001 or shortly thereafter, Amigo became aware that Equilon intended to convert its Texaco-branded assets to the Shell brand.  Berridge Affidavit dated Nov. 13, 2003 at ¶ 4.  At that time, the parties discussed Equilon's upcoming nationwide Shell rebranding plan, the "Fast Fusion Program."  *Id.* at ¶ 21(e).  Equilon initiated the Fast Fusion Program in early 2002, and throughout that year it discussed with Amigo the potential for converting its Texaco-branded stations to the Shell brand. In addition, beginning in late 2001 until the summer of 2002, Amigo was in negotiations with several franchisors, including both Equilon and ConocoPhillips, for terms relating to a new WMA.

In a letter dated February 4, 2002, Equilon sent a letter to Amigo (along with every other wholesaler subject to a Texaco-WMA) regarding the WMA, stating that "on October 9, 2001, Chevron Corporation acquired Texaco Inc. to form ChevronTexaco Corporation, the current owner of Texaco trademarks and identifications, an ultimate effect of which is that Equilon's license to use Texaco trademarks and identifications is expected to end on June 30, 2006."  The letter goes on to state that Equilon intended "to retain the vast majority of its current Texaco branded wholesalers and their Retail Outlets with the Shell brand."  In addition, the letter states that while Equilon will not be renewing the current Texaco-WMA, it will be extending the Texaco-WMA through June 30, 2006:

>Since your current Agreement expires by its terms prior to the
>Effective Date (June 30, 2006), subject to the next paragraph, Equilon
>hereby extends the Agreement to and including the Effective Date, on
>the same terms and conditions as in effect during the last month of the

primary term of the Agreement.

Equilon reserves all of its rights, including but not limited to the right to supplement or rescind the extension referenced above or to supplement or rescind this notice with another notice based on another ground for termination or renewal.

In a letter dated January 20, 2003, Equilon offered Amigo a replacement Shell-brand WMA ("Shell-WMA") containing the same terms and conditions that it offered to all other Texaco-brand wholesalers who participated in the Fast Fusion Program and to all Shell-brand wholesalers. However, Amigo and Equilon were never able to agree to terms, and Amigo refused to sign the Shell-WMA. In late June or early July of 2002, Amigo had signed a contract with ConocoPhillips under which it was obligated to rebrand all 45 of its retail outlets to the Phillips 66 brand (including the eleven locations that were the subject of the Purchase Agreement and its related Brand Covenant) effective June 30, 2004—the Brand Expiration Date contained in Equilon's Waiver and Release Agreement.[5]

By letter dated August 7, 2003, Equilon informed Amigo that Equilon was "rescinding" the extension of the current Texaco-WMA until June 30, 2006, and that it did not intend to renew the Texaco franchise relationship with Amigo because of Amigo's refusal to execute the Shell-WMA. According to Equilon, the Texaco-WMA had expired by its own terms on June 30, 2002 and would be non-renewed as of November 30, 2003.

On July 16, 2003, Amigo filed its Complaint for Declaratory Judgment in the First Judicial District Court, Santa Fe County, New Mexico. In its original complaint, Amigo's sole cause of

---

[5] There is a fact dispute regarding whether Amigo informed Shell of its agreement with ConocoPhillips in a timely manner, although that fact is not material with respect to the issues addressed herein.

action was for declaratory judgment.  However, on September 23, 2003, Amigo filed its First Amended Complaint for Damages, Injunctive Relief and Declaratory Judgment, asserting claims for violation of the PMPA (damages and injunctive relief) and seeking a declaration of the rights and obligations of the parties under the agreements between them and under the applicable provisions of the PMPA.  Amigo claims that Equilon violated the PMPA by rescinding the February 4, 2002 extension of the Texaco-WMA, an act that it alleges to be discriminatory and not in the ordinary course of business.  First Amended Complaint at ¶ 28.  Amigo also alleges that Equilon's proposed Shell-WMA would have unlawfully required it to release or waive its rights under state law, and that Equilon's attempt to force Amigo to sign it was not in good faith, all in violation of the PMPA.  *Id.* at ¶ 30-31.  On October 16, 2003, Equilon removed this action to the United States District Court for the District of New Mexico, and on October 23, 2003 it filed its Answer and Counterclaim. Equilon's counterclaims against Amigo include anticipatory breach of contract and a request for declaratory judgment.

Also on October 23, 2003, Amigo moved for preliminary injunction prohibiting Equilon from terminating Amigo's Texaco-WMA and from non-renewing the parties' franchise relationship pending a judgment on the merits of the case.  In a Memorandum Opinion and Order entered on November 25, 2003, Chief United States District Judge Martha Vázquez granted Amigo's motion and granted the relief it requested.  On June 18, 2004, this case was administratively transferred from Judge Vázquez to the undersigned federal district judge.

## DISCUSSION

I.   **AMIGO'S CLAIMS UNDER THE PMPA**

   A.   **The Purpose of the PMPA**

   In passing the PMPA, Congress intended to establish minimum federal standards for the termination and non-renewal of franchise agreements between small businesses and large oil companies. *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir. 1989) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S. Code Cong. & Admin. News 873, 877). The PMPA affords protection to franchisees because "Congress found that [franchisors] had been using their power over franchisees to further their own self-interest." *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 482 (3d Cir. 1987) (en banc). For example, Congress wanted to "establish protection for franchisees from arbitrary or discriminatory termination ... of their franchises." *Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304 (2d Cir. 1986) (citation omitted). Another primary concern of Congress was to alleviate the potential use by large oil companies of threats and coercion to force adherence to their corporate marketing policies. *May-Som Gulf*, 869 F.2d at 921. Congress therefore enacted the PMPA to ensure that franchisees would not suffer arbitrary or discriminatory treatment at the hands of the more powerful franchisor. *Id*.

   The statute protects franchisees by prohibiting termination or nonrenewal of franchises except on specified grounds. 15 U.S.C. § 2802(b); *see generally Slatky*, 830 F.2d at 478-79. This limitation generally prohibits "the arbitrary and discriminatory termination or nonrenewal of a franchise." *Sandlin v. Texaco Refining and Marketing, Inc.*, 900 F.2d 1479, 1480 (10th Cir. 1990). Section 2802(b)(2) lists grounds upon which a franchisor may either terminate or nonrenew a franchise relationship. These include the franchisee's failure to comply with provisions of the franchise, the

11

occurrence of an event relevant to the franchise relationship and as a result of which termination or nonrenewal is reasonable, a written agreement between the parties to terminate or nonrenew, or the franchisor's good faith decision to withdraw from marketing motor fuel in the relevant geographical area.  15 U.S.C. § 2802(b)(2).  In contrast, Section 2802(b)(3) lists grounds that justify nonrenewal only.  These include the failure of the parties to agree to changes or additions to the provisions of the franchise, customer complaints regarding the franchisee, the franchisee's failure to operate the premises in a clean and safe manner, or certain good faith business decisions by the franchisor not applicable here.  15 U.S.C. § 2802(b)(3).

  **B. Equilon's "Recission" of Its Extension of the Texaco-WMA<br>Under Sections 2802(b)(2) and (3) of the PMPA**

  The facts relating to this issue are undisputed: by letter dated February 4, 2002 and titled "Notice of Nonrenewal," Equilon unilaterally extended the term of its existing Texaco-WMA with Amigo until June 30, 2006, the date upon which it would lose the right to grant Amigo the right to use the Texaco trademark.  However, in the same letter, Equilon also gave notice to Amigo that it would not be renewing the Texaco-WMA, which would terminate on June 30, 2006.  Finally, Equilon expressly reserved the "right to supplement or rescind the extension" of the term of the Texaco-WMA. The question now before the Court is whether, as a matter of law, Equilon violated the PMPA when, on August 7, 2003, in a letter titled "Recission of Notice of Nonrenewal," Equilon rescinded the extension of the term of the Texaco-WMA.  According to Equilon, as a result of its recission, the Texaco-WMA had expired by its own terms more than a year earlier, on June 30, 2002.  The following day, August 8, 2003, Equilon informed Amigo by letter that the franchise relationship between the parties would not be renewed after November 30, 2003.

12

In order to evaluate Equilon's actions under the PMPA, the Court's analysis must begin with the statute itself. The PMPA defines "fail to renew" and "nonrenewal" as "a failure to reinstate, continue, or extend the franchise relationship ... at the conclusion of the term, or on the expiration date, stated in the relevant franchise." 15 U.S.C. § 2801(14). Further, "[t]he term 'termination' includes cancellation." *Id*. at § 2801(17). Under these statutory definitions, a nonrenewal is a failure to continue an existing franchise after its expiration date, while a termination of a franchise is an act cancelling the franchise while it is still in effect. The PMPA prohibits franchisors such as Equilon from terminating or failing to renew a franchise except for reasons outlined in the statute. 15 U.S.C. § 2802(a). Thus, the first step is to understand Equilon's actions in light of this statutory framework.

By virtue of its February 4, 2002, letter, Equilon took two separate and distinct actions. First, it extended the term of the current Texaco-WMA until June 30, 2006, and second, it gave notice of its nonrenewal of that agreement effective the same date based on its upcoming loss of the right to grant the right to use the Texaco trademark. In other words, Equilon informed Amigo that it intended to continue their current franchise relationship until June 30, 2006, at which point their relationship would not be renewed. This much is not in dispute. The source of the controversy is Equilon's August 7, 2003 letter, in which it purported to effect, in its own words, a "rescission" of its prior unilateral extension of the Texaco-WMA. It is undisputed that Equilon did this because Amigo had refused to rebrand to Shell and execute a new Shell-WMA. Because the Texaco-WMA's original agreed-upon termination date—June 30, 2002—had already passed, the practical effect of such "rescission" was to *terminate* the Texaco-WMA, regardless of the label that Equilon uses to describe its actions. In its August 8, 2003 letter, Equilon states that "the franchise relationship between Amigo and Shell following the Recission will not be renewed after November 30, 2003,"

13

which is the effective date for its termination of the franchise.  In Section 2802(b)(2), the PMPA outlines the circumstances under which a franchisor may terminate a franchise relationship.  None of those circumstances is present here, and consequently under the PMPA, Equilon has effected an improper termination of the franchise with Amigo.

Equilon argues that its actions were not a termination, but rather a nonrenewal of the Texaco-WMA that it carried out in good faith under Section 2802(b)(3)(A).  To this end, Equilon relies upon *Unified Dealer Group v. Tosco Corp.*, 16 F.Supp.2d 1137 (N.D. Cal. 1998), *aff'd*, 216 F.3d 1085 (9th Cir. 2000).  However, that case is unavailing.  In *Tosco*, the defendant-franchisor had existing franchises with various BP-branded service station dealers when it acquired the right to the "76" trademark.  *Id*. at 1139.  Before the expiration of those franchises, Tosco offered to renew those franchise relationships only if the service stations would rebrand to the "76" brand.  The service station dealers refused, and Tosco gave notice of nonrenewal on the grounds that the parties could not agree to changes in the provisions of the franchise under Section 2802(b)(3)(A).  The court found that Tosco's actions were proper under the PMPA.  However, *Tosco* is distinguishable in several important respects.  Tosco insisted upon rebranding as a prerequisite to renewal of the franchise once it expired by its express terms; in contrast, Equilon *terminated* the Texaco-WMA *before* its June 30, 2006 expiration date—an expiration date set unilaterally by Equilon—because of Amigo's failure to rebrand.  Unlike Tosco, Equilon did not require rebranding as a condition of renewal, but rather as an alternative to termination.  "Under section 2802(b)(3)(A) a franchisor may not *terminate a franchise agreement* because a franchisee refused to agree to a change in the provisions of the franchise."  *Tosco*, 16 F.Supp.2d at 1141 (emphasis in original).

For similar reasons, *Seckler v. Star Enterprise*, 124 F.3d 1399, 1403 (11th Cir. 1997) and

*Akky v. BP America*, 73 F.3d 974, 975 (9th Cir. 1996) do not aid Equilon's argument.  The court in *Seckler* observed that "[t]he PMPA does not articulate rules for when a franchisor may or may not rescind a notice of termination or nonrenewal."  124 F.3d at 1403.  That statement is true, as far as it goes.  Both *Akky* and *Seckler* deal with situations in which a franchisor gives *notice* of nonrenewal or termination, but then changes its mind and withdraws such notice before the nonrenewal or the termination actually occur.  The courts in those cases observed that the PMPA does not restrict a franchisor's ability to take such action. *Seckler*, 124 F.3d at 1403; *Akky*, 73 F.3d at 975.  Once again, however, Equilon relies upon cases that are inapposite.  In its August 7, 2003 letter, Equilon purported not only to withdraw its notice of non-renewal, but also to withdraw its notice of extension of the Texaco-WMA's term to June 30, 2006.  In withdrawing the extension, Equilon effected a termination of the franchise.  Neither *Seckler* nor *Akky* holds that a franchisor may unilaterally rescind an extension of the franchise term.

In the alternative, Equilon argues that the PMPA authorized it to terminate its franchise relationship with Amigo due to its upcoming loss of the right to use the Texaco trademark, citing *Russo v. Texaco, Inc.*, 808 F.2d 221 (2d Cir. 1986) and 15 U.S.C. §§ 2802(b)(2)(C) and 2802(c)(6).  Equilon further argues that it was not restricted to terminating the franchise on the date of the loss of trademark, but rather was permitted to terminate sooner using its own business judgment, subject to the "good faith" and "normal course of business" requirements of Section 2802(b)(3)(A).  These arguments are unavailing.  First, Section 2802(b)(3)(A) does not apply here because it addresses only nonrenewal, not termination.  Therefore, Equilon's arguments regarding its subjective good faith, an important factor under Section 2802(b)(3)(A), are irrelevant.  Second, *Russo* is distinguishable.  In *Russo*, the franchisor lost its right to use the Getty brand as of July 11, 1985.  808 F.2d at 224 n.2.

15

In accordance with the PMPA, it provided notice of termination to its franchisees on March 4, 1985, just over 120 days before its loss of the trademark. *See id.* Unlike Equilon, the franchisor in *Russo* did not attempt to terminate the franchise more than two years before it would lose the right to use the trademark. Furthermore, as Amigo correctly points out, Section 2802(c)(6) of the PMPA lists the franchisor's loss of the right to grant the right to use the trademark, not its anticipated or future loss, as an event based upon which termination is reasonable. Equilon's own initial actions bear this out, because in its February 4, 2002 letter it notified Amigo of the impending loss of the trademark but was prepared to continue the franchise until June 30, 2006, the date of actual loss.

Accordingly, the Court finds that under the undisputed material facts, Equilon improperly terminated its Texaco-WMA with Amigo in violation of the PMPA.

**C.      Promissory Estoppel**

In the alternative, Amigo argues that it reasonably and detrimentally relied upon Equilon's extension of the term of the Texaco-WMA such that the doctrine of promissory estoppel bars Equilon from rescinding that decision. Amigo also argues that, as a result of Equilon's improper acts and through application of promissory estoppel principles, Equilon violated the PMPA by rescinding the extension. However, having already found that Equilon's "rescission" violated the express provisions of the statute, the Court need not also reach the question of whether the principles of promissory estoppel apply.

**D.      Waiver of State Law Rights Under Section 2805(f)(1)**

Amigo also contends that Equilon violated the PMPA by attempting to force Amigo to waive

its rights under New Mexico state law.[6]  Specifically, Amigo asserts that Equilon's proposed replacement Shell-WMA contained waivers of state law rights, and that Equilon offered the Shell-WMA to Amigo on a "take it or leave it" basis and would accept no negotiation of its terms.  Equilon responds that Amigo has failed to set forth sufficient evidence that it conditioned its offer of the Shell-WMA on Amigo's acceptance of the waivers because Amigo never attempted to negotiate with Equilon on that issue.

As one court has explained, in order for a franchisee to succeed on a claim under Section 2805(f), it must prove that the franchisor offered it a franchise agreement containing waivers of state law rights on a "take-it-or-leave-it" basis.

> It is important to note that it was **only the "take it or leave it"/"as is" presentation** of the new agreement(s) which rendered these provisions violative of Section 2805(f). There is no broad prohibition on the voluntary waiver of rights guaranteed under state or federal law that may otherwise be waived.... It is when renewal is **conditioned on** such a waiver that Section 2805(f) is implicated.

*Coast Village, Inc. v. Equilon Enters., LLC*, 163 F.Supp.2d 1136, 1178 n.38 (C.D. Cal. 2001) (emphasis added).

Again, the facts relating to this aspect of Amigo's PMPA claim are essentially undisputed. Paragraph 15 of the proposed Shell-WMA contains a waiver of the implied warranties of merchantability and fitness for a particular purpose—warranties to which Amigo has a right under New Mexico law.  *See* NMSA 1978, §§ 55-2-314 and -315.  Under Paragraphs 20 and 21, Amigo would be required to waive its right to have its liability in tort assessed pro rata in any case where it

---

[6] Section 2805(f) of the PMPA provides that "[n]o franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive ... any right that the franchisee may have under any valid and applicable State law."

is concurrently liable with Equilon and to waive its right to contribution from Equilon under NMSA 1978, § 41-3A-1 in any case where Amigo and Equilon could be held jointly and severally liable. Neither party disputes that under New Mexico law, these rights and warranties may be waived by contractual agreement.  It is also undisputed that prior agreements between the parties, including the Texaco-WMA at issue in this case, contained identical waivers.

Amigo has not come forward with any evidence to demonstrate that, with regard the specific replacement Shell-WMA at issue in this case, Equilon's position on this contract was "take it or leave it."  Instead, Amigo presents the affidavit of its President and General Manager, Ted Berridge, who testified more generally that as a result of his 26 years of business dealings with Texaco and its successor, Shell (Equilon), he is aware that "the Wholesale Marketer Agreement they present is non-negotiable, essentially a 'take-it-or-leave-it' position," including the provisions at issue here. Berridge Aff. dated Feb. 6, 2004 at ¶ 5.  Amigo also presents deposition testimony from various Equilon officers and managers stating that Equilon's policy has been to use a standard form of WMA and not to negotiate changes to those standard forms.

First, it is true that the mere fact that Amigo's Texaco-WMA contained the same waivers does not necessarily negate Amigo's claim under Section 2805(f)(1).  "[A] franchisor cannot circumvent § 2805(f)(1)'s release and waiver prohibition by offering to renew the parties' franchise relationship on terms and conditions identical to those contained in a prior franchise agreement, whether the prior agreement was entered into before or after the enactment of the statute."  *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 859 (7th Cir. 2002).  To hold otherwise would be to permit a franchisor to "grandfather in" and perpetuate the same disparities in bargaining power that existed before the PMPA was enacted, and which it is designed to eliminate.

18

However, while the record before the Court deomonstrates that Equilon offered a Shell-WMA that included waiver provisions, there is no evidence that Equilon offered it on a "take it or leave it" basis. It is not enough that Amigo assumed that Equilon would not negotiate, or that it show after-the-fact that it was unlikely that Equilon would have negotiated. Rather, Amigo must show that Equilon *conditioned* renewal of the franchise relationship upon Amigo's waiver of state law rights. Amigo has failed to do so, and accordingly Equilon is entitled to summary judgment on this aspect of Amigo's claim.

## II.     EQUILON'S COUNTERCLAIM FOR ANTICIPATORY BREACH OF CONTRACT

In its motion for summary judgment, Equilon asks the Court to enter summary judgment in its favor on its counterclaim against Amigo for its alleged anticipatory breach of the Brand Covenant. "A repudiation which may be treated as a breach justifying nonperformance by the other party must be a distinct, unequivocal, and absolute refusal to perform according to the terms of the agreement." *Viramontes v. Fox*, 65 N.M. 275, 282 (1959). Repudiation can be by act as well as by word. *Hoggard v. City of Carlsbad Through Forrest*, 121 N.M. 166, 168 (Ct. App. 1995). Equilon contends that by entering into a WMA with ConocoPhillips that would require Amigo to rebrand its eleven service stations to the Phillips 66 brand, Amigo anticipatorily repudiated the Brand Covenant.

In order to properly analyze this claim, the Court must determine what the terms of the Brand Covenant are (particularly in light of the difference in the language contained in Paragraph 15.5 of the Purchase Agreement, as contrasted with Exhibit A to that agreement as well as the warranty deeds and assignment of lease that were recorded), and whether or not its terms were waived by Equilon at any point in time.

### A.     Properties Conveyed in Fee Simple

As noted above, the parties' Brand Covenant appears in four places. Paragraph 15.5 of the Purchase Agreement provides that Amigo must "retain a brand offered by Equilon" at each of the relevant retail locations for a period of ten years. In contrast, the Brand Covenant language in Exhibit A to the Purchase Agreement, in the individual warranty deeds, and in the assignment of lease states that Amigo must "retain the Texaco brand" for a period of ten years, and that Amigo has the option to rebrand to another brand offered by Equilon, subject to Equilon's approval.

Under long-established New Mexico law, under certain circumstances a contract to convey real property is merged into the deed:

> It is a well-established rule of law that prior stipulations are merged in the final and formal contract executed by the parties, and this rule applies to a deed or a mortgage based upon a contract to convey. When a deed is delivered and accepted as performance of the contract to convey, the contract is merged in the deed. Though the terms of the deed may vary from those contained in the contract, the deed alone must be looked to to determine the rights of the parties.

*Norment v. Turley*, 24 N.M. 526, 174 P. 999, 1000 (1918).

In *Norment*, the New Mexico Supreme Court went on to state the following exception to the merger doctrine as applied to a contract to convey real property and the subsequent deed:

> There is an exception to the rule stated, which is that the contract of conveyance is not merged upon execution of a deed where under the contract the rights are conferred collaterally and independent of the deed; there being no presumption that the party in accepting the deed intends to give up the covenants of which the deed is not a performance or satisfaction. **Where the right claimed under the contract would vary, change, or alter the agreement in the deed itself, or inheres in the very subject-matter with which the deed deals, a prior contract covering the same subject-matter cannot be shown as against the provisions of the deed.**

*Id*. at 1001 (emphasis added). Eighteen years later, in *Continental Life Ins. Co. v. Smith*, 41 N.M.

82, 64 P.2d 377, 380-381 (1936), the Supreme Court affirmed and reinforced the rule in *Norment*:

> In the absence of fraud, mistake, etc., the following stipulations in contracts for the sale of real estate are conclusively presumed to be merged in a subsequently delivered and accepted deed made in pursuance of such contract, to wit: (1) Those that inhere in the very subject-matter of the deed, such as title, possession, emblements, etc.; (2) those carried into the deed and of the same effect; (3) those of which the subject-matter conflicts with the same subject-matter in the deed. In such cases, the deed alone must be looked to in determining the rights of the parties.

*Id*. at 381. The *Continental Life* court also explained that where the contract contains obligations between the parties that are not fulfilled by the mere delivery of a deed, then the court should ascertain either from the deed or other evidence whether it was the intent of the parties to surrender those obligations. *Id*. However, the court also clarified that this principle applies only when the disputed covenants or obligations appear in the contract, but not in the deed: "If covenants regarding the same subject-matter, consistent or inconsistent, with those in the contract *appear in the deed*, they are conclusively presumed to have merged therein; but if the deed contain no evidence of intention on the subject, then the question is open to other evidence to determine such intention ..." *Id*. at 380-81 (emphasis added) (citing *Morris v. Whitcher*, 20 N.Y. 41 (N.Y. Ct. App. Sep. Term. 1859)).

Applying the foregoing principles, the Court concludes that with regard to the Brand Covenant, the Purchase Agreement was merged into each of the warranty deeds recorded for the eight properties conveyed in fee simple. The Brand Covenant satisfies both the second and third categories of stipulations in contracts outlined in *Continental Life* which are presumptively merged into the corresponding deeds. First, the parties' stipulation to a Brand Covenant in the Purchase Agreement was carried into the deed and is of the same effect—that is, to restrict the brand of gasoline that Amigo and its successors could sell at each of the eight fee locations. The Purchase

Agreement itself requires that the Brand Covenant be included in the deeds, survives the closing, and runs with the land.  Second, the language of the two Brand Covenants is in conflict—while one would restrict Amigo to selling Texaco fuels only, the other would allow Amigo to sell any brand offered by Equilon provided that Equilon granted its permission.  Because Equilon will lose the right to sell the Texaco brand as of June 30, 2006, this is a material conflict.  Accordingly, under *Continental Life*, the Purchase Agreement is "conclusively presumed to be merged" into the warranty deeds. Under the reasoning of that case, the appearance of the Brand Covenant in the deed precludes the need to examine the parties' intentions on the matter.  *Continental Life*, 64 P.2d at 380-381

Equilon argues that the merger doctrine does not apply because Amigo did not satisfy the Brand Covenant merely by accepting the warranty deeds.  Equilon cites *Barela v. Locer*, 103 N.M. 395 (1985), in which the court held that a contractual right of first refusal to purchase mineral rights did not merge into a deed because the seller of the property did not grant the buyer his right of first refusal merely by delivering the deed.  However, *Barela* is distinguishable because unlike this case, the deed did not contain a provision specifically addressing the right of first refusal, and therefore there were no conflicting provisions in the contract and deed.  *Id*. at 396.  None of the three *Continental Life* conditions were satisfied, and therefore the court in *Barela* examined the parties' intent and determined that the merger doctrine did not apply and the contractual right of first refusal survived.  *Id*. at 397-98.  By contrast, this case fits squarely into the rationale of *Continental Life*, and because the deed addresses the same subject matter as the contract, there is no need to examine the intent of the partes. Accordingly, the Court finds that the Brand Covenant contained in the Purchase Agreement was merged into the eight warranty deeds at issue in this case.

Next, Equilon contends that merely because the Brand Covenant appears in deeds, it is not

a "deed restriction." Equilon relies on several arguments to support its contention. First, Equilon argues that the Brand Covenant is not a restriction at all, because instead of prohibiting the sale of non-Equilon products, the Brand Covenant "affirmatively obligates" Amigo to sell Equilon's products. The Court finds this argument to be without merit. Whether requiring Amigo and its successors to sell a brand offered by Equilon or specifically the Texaco brand, the Brand Covenant places a restriction on the owner's use of the real property.

In addition, Equilon contends that the Brand Covenant is not contained only in deeds, but also in the Purchase Agreement, and therefore it is a bargained-for contractual obligation not waived by the Waiver and Release Agreement. However, as explained above, as to the eight properties conveyed in fee simple, the Brand Covenant contained in the Purchase Agreement has been merged into the Brand Covenant contained in the deeds. Therefore, as to those properties the Brand Covenant is contained only in deeds, and it is a deed restriction within the meaning of that term.

Finally, Equilon contends that its February 13, 2002 Waiver and Release Agreement with Texaco does not apply.[7] In that agreement, Equilon agreed to waive and release "all deed restrictions prohibiting or restricting the sale of Refinery Fuel Products not sold by Equilon at any Texaco branded Service Station." In light of the foregoing analysis, the Court concludes that provision is satisfied. However, the agreement also goes on to state that the waiver and release of deed restrictions does "not apply with respect to any Texaco branded Service Station whose owner, dealer, or *wholesale marketer terminates* its Texaco brand relationship with Equilon prior to the

---

[7] The parties also dispute the applicability of the FTC's Consent Order, to which Equilon was not a party. At issue there is whether or not Amigo is an intended third party beneficiary of the Consent Order. Because it finds that Equilon's own Waiver and Release Agreement applies to the deed restrictions here, the Court need not reach that argument.

Brand Expiration Date [June 30, 2004]." (emphasis added).   Relying upon this language, Equilon argues that the waiver and release does not apply to Amigo because Equilon properly nonrenewed the Texaco-WMA as of November 30, 2003, leaving Amigo without a valid WMA as of June 30, 2004.

Once again, Equilon's argument is untenable.  The express terms of the Waiver and Release Agreement provide that the waiver and release does not apply to a wholesale marketer that terminates its Texaco brand relationship with Equilon before June 30, 2004.  That is not what happened here; Amigo did not terminate the Texaco-WMA .  As discussed in Part I, *supra*, it was Equilon who terminated the Texaco-WMA through its August 7, 2003 "rescission and nonrenewal", in violation of the PMPA.  Amigo, the wholesale marketer, did not terminate its Texaco brand relationship with Equilon prior to June 30, 2004, and therefore the exception to the waiver does not apply.

Accordingly, the Court concludes that the Waiver and Release Agreement applies to the eight properties conveyed in fee simple.  As a result, there was to be no Brand Covenant in force as of June 30, 2004, and as a matter of law Amigo did not anticipatorily breach the Brand Covenant by agreeing with ConocoPhillips to rebrand after that date.  Furthermore, for the reasons stated above, with regard to all eleven properties at issue in this case, the Court concludes that by virtue of its February 13, 2002 Waiver and Release Agreement, Equilon has waived amounts due under its incentive agreements with Amigo as of June 30, 2004.

Therefore, Amigo is entitled to summary judgment in its favor on Equilon's claim for anticipatory breach of contract as it relates to the eight fee simple properties.

**B.    Leased Properties**

Through both the Purchase Agreement and the recorded assignment of lease, Equilon

24

transferred its leasehold interests in three properties to Amigo.[8]  Once again, the Brand Covenant language in the assignment of lease matches that contained in Exhibit A to the Purchase agreement and requires only that Amigo retain the Texaco brand unless Equilon grants written permission to Amigo to switch to another brand offered by Equilon.  The issue here is very similar to that presented with regard to the eight  properties conveyed in fee simple: what version of the Brand Covenant controls?

As discussed above, New Mexico has developed the doctrine of merger as it applies to conflicts between the terms contained in contracts for the sale of real property and those contained in subsequent deeds.  However, New Mexico courts have applied the merger doctrine outside those narrow circumstances and have concluded more broadly that where an earlier agreement is in conflict with a later contract dealing with the same subject matter, the later contract controls.  As this Court held in *K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 164 F.Supp.2d 1260, 1263 (D.N.M. 2001) (Black, J.), *rev'd on other grounds*, 314 F.3d 494 (10th Cir. 2002), "[w]hen two parties execute a second contract that deals with the same subject matter as the first, the two contracts must be interpreted together; insofar as the contracts are inconsistent, the later one prevails." (citing 6 Arthur L. Corbin, *Corbin on Contracts*, §§ 1293 and 1296 (1962)).  The New Mexico Supreme Court is in accord:

> The doctrine of merger is a contract principle that prior agreements on the same subject are presumed to be included in the final contract. Merger applies only to successive agreements that contain inconsistent terms. Under these conditions, an antecedent agreement is deemed to

_____

[8] At the October 14, 2005 hearing, counsel for Amigo informed the Court that two of the three leases had expired, although he provided no details on the issue. The question of what impact, if any, their expiration may have on the issue of damages is beyond the scope of this Memorandum Opinion and Order.

have merged into the more recent contract.

*Superior Concrete Pumping, Inc. v. David Montoya Const., Inc.*, 108 N.M. 401, 404 (1989) (citations omitted)).  *Accord Richards v. Allianz Life Ins. Co. of N. America,* 2003-NMCA-001 ¶ 12, 133 N.M. 229.  The later agreement may make no reference to the earlier contract, yet if the new agreement contains terms that are inconsistent with the prior agreement, "the fact of inconsistency is itself a sufficient indication of intention to abrogate the old and substitute the new."  Corbin on Contracts at § 1296.  As explained above, there is conflict between Paragraph 15.5 of the Purchase Agreement and the Brand Covenant language contained in the subsequent assignment of lease.  Under the merger doctrine, the language of the later agreement controls.

Equilon argues that the Court should not find merger unless it also finds that the parties intended that the later contract control, citing *Superior Concrete*, 108 N.M. at 404.  The Court finds ample evidence of such intent on the current record.  First, in the Purchase Agreement the parties agreed that the Brand Covenant would run with the land, and in that agreement they expressly stipulated to a form of that covenant that would be included in the assignment of leases as well as all warranty deeds relating to the eleven properties.  In accordance with the requirements of Paragraph 15.5, the parties attached that form of the covenant as Exhibit A to the Purchase Agreement, signifying their desire that it's provisions act as the operative Brand Covenant.  The parties then took the final step of actually incorporating that language into both the deeds and the assignment of leases.  This indicates their mutual intent to be governed by the language in Exhibit A.  Equilon has neither argued nor presented any evidence to suggest that the narrower brand covenant language contained in Exhibit A and the assignment of lease was a result of either fraud or unilateral or mutual mistake.

26

Second, the timing of the various agreements indicates that the parties acted with intent, not by mistake, in using the narrower form of Brand Covenant. The parties executed the Purchase Agreement on August 17, 2000. However, if they did not intend to use the Brand Covenant language contained in Exhibit A to that agreement, they had sufficient time to correct their error. Equilon signed the assignment of lease and the warranty deeds on October 30, 2000 and November 3, 2000, respectively, and recorded all of those documents on November 9, 2000. The passage of approximately two and a half months and the corresponding failure to alter the language evidences the parties' intent.

Third, by choosing the narrower, "Texaco-brand" Brand Covenant language to be included in the warranty deeds and the assignment of lease to be recorded in the real property records, the parties mutually agreed that it would be the language that would put the world on notice as to the covenants and restrictions corresponding to each property. As sophisticated businesses, both Amigo and Equilon knew that third parties would look to these recorded documents, not to an earlier Purchase Agreement, in order to determine the status of each piece of land, including all pertinent covenants.

For all of the foregoing reasons, the Court concludes that the parties did intend that the subsequent and more specific Texaco Brand Covenant in the assignment of lease would control over the Brand Covenant contained in Paragraph 15.5 of the Purchase Agreement. Accordingly, the Court finds that under New Mexico law, the subsequent agreement controls.

To this point, the Court's analyses of the fee properties and the leased properties has been similar; however, at this point they diverge. As discussed above, in its February 13, 2002 Waiver and Release Agreement with Texaco, Equilon agreed to waive and release "all **deed** restrictions

27

prohibiting or restricting the sale of motor fuel not sold by Equilon [] at any Texaco retail outlet ..."
(emphasis added).  The Waiver and Release Agreement mentions nothing of restrictions contained
in leases as opposed to deeds, and by its plain language it does not apply here.  Although Amigo has
argued in a somewhat summary fashion that a restriction on the future use of property that is
memorialized in a lease assignment should be treated the same as a deed restriction, it has failed to
come forward with any convincing factual or legal rationale to support its argument.  Therefore, the
Court finds that, for the purposes of Equilon's Waiver and Release Agreement, a lease restriction is
not a deed restriction, and therefore as to the three leased properties, Equilon has not waived its
rights.

As a result of the foregoing, as required under the applicable Brand Covenant, Amigo was
obligated to retain the Texaco brand at all three leased properties.  Although initially Amigo had that
obligation until 2010, ultimately Amigo would be constrained to use the Texaco trademark only until
June 30, 2006, when Equilon would lose the right to offer Amigo the right to use the Texaco
trademark.  Amigo's contract with ConocoPhillips in July of 2002 to rebrand these three locations
to the Phillips 66 brand beginning June 30, 2004 constituted an anticipatory repudiation of its
obligations for the remaining two years under the Brand Covenant.

Accordingly, Equilon is entitled to partial summary judgment in its favor on its claim for
anticipatory breach of contract as it relates to the three leased properties.

In accordance with the foregoing,

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that:

(1)     *Defendant's Motion for Summary Judgment* [Doc. No. 15] is **GRANTED IN PART and
DENIED IN PART**;

28

(2)     *Plaintiff's Motion for Partial Summary Judgment* [Doc. No. 28] is **GRANTED IN PART**

**and DENIED IN PART**;

(3)     Plaintiff is entitled to summary judgment in its favor on its claim for violation of the PMPA,

as well as on that portion of Defendant's counterclaim for anticipatory breach of contract relating to

the eight properties conveyed to Plaintiff in fee simple;

(4)     Defendant is entitled to summary judgment in its favor on that portion of its counterclaim for

anticipatory breach of contract relating to the three leasehold properties assigned to Plaintiff;

(5)     *Defendant's Motion to Strike Plaintiff's Second Supplemental Brief* [Doc. No. 81] is

**GRANTED**, and Doc. No. 80 is hereby **STRICKEN** from the record.


_____

**UNITED STATES DISTRICT JUDGE**